# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| JOHNNY FRAZIER ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | No. 06 CV 2141 |
| AMERICAN PHARMACEUTICAL ) | |
| PARTNERS, INC., ) | Judge Joan H. Lefkow |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Johnny Frazier ("Frazier") filed a three-count amended complaint against defendant American Pharmaceutical Partners, Inc., now known as Abraxis BioScience, Inc. ("Abraxis"), for employment discrimination pursuant to Title VII of the of the Civil Rights Act of 1964 and 28 U.S.C. § 1981. Counts I and III, brought pursuant to Title VII and § 1981, respectively, allege that Abraxis Pharmaceutical discriminated against Frazier on the basis of his race by discharging him and treating him differently from employees not of his race. Count II, brought pursuant to Title VII, alleges that Abraxis, after rehiring Frazier, retaliated against him for his filing of a charge of discrimination with a government civil rights agency. Presently before the court is Abraxis's motion for summary judgment. For the following reasons, defendant's motion [#33] is granted.

## JURISDICTION

The court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1343 (civil rights claim) and 42 U.S.C. § 2000e-5(f)(3) (Title VII claims).

## STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in the pleadings, depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one which might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In the context of employment discrimination, "summary judgment is warranted where the evidence, interpreted favorably to the plaintiff, could not persuade a reasonable jury that the employer had discriminated against the plaintiff." *Jones* v.

*Union Pacific R.R. Co.*, 302 F.3d 735, 739–40 (7th Cir. 2002) (internal quotation marks and alterations omitted).

**LOCAL RULE 56.1**

Local Rule 56.1(a) provides that a motion for summary judgment must include, *inter alia*, a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. R. 56.1(a). This statement of material facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." *Id.* Part (b) of Local Rule 56.1 requires a party opposing summary judgment to file, *inter alia*, a concise response to the movant's statement of material facts. N.D. Ill. R. 56.1(b). For purposes relevant here, that statement is required to include "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. R. 56.1(b)(3). The rule makes clear that "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." N.D. Ill. R. 56.1; *Bordelon* v. *Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000) (noting "the consequence for noncompliance—the movant's assertions of material fact are deemed admitted").

As required by Local Rule 56.1, Abraxis, the moving party, filed a statement of material facts. Def.'s R. 56.1 Statement of Material Facts, Dkt. No. 36. In response to the motion for summary judgment, Frazier purports to submit "a supporting Memorandum of Law and

3

Statement of Facts." Dkt. No. 43, at 1. Neither of the two documents filed by Frazier in response to defendant's motion, however, could be said to comply even partially with the requirements of Local Rule 56.1(b)(3). The first is a one-page document entitled "Plaintiff's Response to Motion for Summary Judgment," which merely requests that the court deny defendant's motion for summary judgment and refers to the second document. Dkt. No. 43, at 1. The second is a twelve-page memorandum entitled "Plaintiff's Memorandum in Support of Its [*sic*] Response to Defendant's Motion for Summary Judgment." Pl.'s Resp., Dkt. No. 44, at 1. Although this memorandum is composed largely of sentences containing factual allegations followed by specific citations to the record, the document is organized not in the form of short numbered paragraphs, as required by Local Rule 56.1, but as a legal memorandum, in the form of long unnumbered paragraphs organized under broad subject headings, such as "(1) Discrimination" and "(2) Retaliation." Pl.'s Resp., Dkt. No. 44, at 6. Nowhere, moreover, does plaintiff respond to defendant's Local Rule 56.1 statement of material facts as required by Local Rule 56.1(b). Plaintiff's failure to file such a response requires that, to the extent that defendant's material facts were submitted in conformity with Local Rule 56.1 and are adequately supported by the record, those facts be deemed admitted.

# BACKGROUND[1]

Frazier, who is African-American, began working at Abraxis in June 2004. At first, Frazier was a contract, temporary-to-hire employee in the company's Microbiology Finished Product Group, but in December 2004 he became a regular full-time employee in the same group. From June 14, 2004 until December 15, 2005, plaintiff worked the first shift and reported to Finished Group Supervisor Christine Rizk ("Rizk"). Rizk reported to Jeff DeSario ("DeSario"), Manager of the Microbiology Department. As part of the Finished Product Group, Frazier's primary responsibility was to perform "sterility testing" of products. This task involved obtaining samples from the manufacturing department, preparing them for testing, transferring them to the "sterility suite" within the microbiology lab, and performing tests. Within the sterility suite, there are two "hoods"—benches that provide air flow to keep out contaminants—which means that two individuals may conduct sterility testing at the same time.

Plaintiff was the person primarily responsible for doing sterility testing on the first shift. Due to contamination that was discovered in the manufacturing area in the summer of 2005, new protocols were put into place which required triplicate sterility testing of products and other more stringent cleaning processes. These new protocols required Frazier and other employees to work longer hours. Frazier was paid for any overtime he worked. Frazier was also required, on occasion, to retrieve empty blue drums from the loading dock, in addition to his primary sterility testing duties. The drums were then filled with sterility suite waste, such as glassware used for

---

[1] As discussed above, the court is required to accept as true those material facts submitted by the defendant in accord with Local Rule 56.1 that are adequately supported by the record. Nevertheless, unless otherwise specified, the facts recited here are those which the plaintiff has admitted in his deposition.

testing, and placed in the hallway outside of the lab for removal by one of the Finished Product Group employees.

Beginning in the summer of 2005, Supervisor Rizk required each employee in the Finished Product Group to provide her with a list of his or her daily activities. Frazier did so from at least July 2005 to September 2005 but stopped around September 16, 2005 when, after seeing some of the summaries piled up in Rizk's mailbox, he came to believe the lists were not being reviewed by anyone.

On or about December 13, 2005, plaintiff noticed that lots of a product named Vancomycin would be coming up for testing. Frazier told Rizk that, because of the new triplicate testing protocol, he anticipated that the Vancomycin would put a strain on the department. In particular, Frazier was concerned that it would now take him three times as long—seven and half hours instead of the usual two and half—to conduct the testing of the Vancomycin. Rizk told Frazier that she would do what she could in order to assist him in getting the testing done. On December 14, Rizk showed Frazier a list of his assignments for the following day, which included sterility testing for Vancomycin and two other drugs, and told him that she had done her best with the schedule.

Upon arrival at work on the morning of December 15, Frazier found on his desk the same list that Rizk had shown him the night before. Plaintiff again complained to Rizk that the testing would require him to stay longer than his scheduled shift and that he would like other lab employees to assist him. Rizk told him that she had done the best she could with his assignments. From about 7:00 a.m. to 10:00 a.m., Frazier gathered, labeled and prepped the samples for testing. At 10:00 a.m., Frazier, Rizk, and DeSario (to whom Rizk reported) met to

discuss Frazier's complaints about his workload. They told Frazier that, in order to increase his efficiency, he could use both of the testing hoods in the sterility suite. After the meeting, plaintiff left for lunch.

When he returned from lunch around 11:45 a.m., Frazier was given a reduced work assignment list that contained only one of the three drugs; his other assignments had been given to another lab employee. Frazier did not begin testing after his return from lunch. He went to Human Resources and complained about his workload to Kelly Soja ("Soja"), a Staffing and Employee Relations Representative. Soja told him that she would look into the matter and get back to him before the end of the day. Plaintiff then returned to the lab but decided not to start testing because another lab employee, Amanda Glas, was using one of the two sterility hoods. Because Rizk and DeSario had recommended that he use both hoods, Frazier determined that he could not begin testing under one hood. Plaintiff then went to the cafeteria, where he read a newspaper, talked to colleagues, and waited for Soja to get back to him.

At 1:30 p.m., Frazier returned to the lab but again decided not to begin testing because Glas was still using one of the two sterility hoods. At about 2:00 p.m., he went back to the cafeteria. At 2:45 p.m., he returned to the lab and checked his email to see if Soja had responded. At about 3:00 p.m., he received a call from Soja, who asked that he come to her office. After Frazier met briefly with Soja in her office, she told him that they would go to the office of Brad Hughes ("Hughes"), the Human Resources Manager.

According to Frazier, shortly after sitting down with Hughes, Hughes told Frazier, "I already know what's going on. You don't want to work. You are being insubordinate." Pl.'s Dep. (Ex. A to Def.'s Mot.) at 130. Frazier told Hughes that he wanted to tell his side of what

was going on.[2]  Hughes then asked Frazier if he had anything in his locker and said that he was going to call Rizk.  Frazier reported that Hughes appeared "hostile and visual," so he rose from his seat to leave.  Hughes forcefully grabbed his shoulder to try to keep him from leaving.  Frazier broke loose and proceeded to leave Hughes's office anyhow, and Hughes followed behind him, asking Frazier why he was refusing to do his work and being insubordinate.  The two exchanged profanities.  According to Frazier, Hughes told him that he would not get his final paycheck until he turned in his badge.  Frazier then gathered his things from the lab, turned in his badge, received his paycheck, and left.  It is Frazier's contention that he was terminated when he left work that day.

The next day, Friday, December 16, 2005, had previously been scheduled as a day off for Frazier.  Hughes called Frazier at home early that morning and apologized for his behavior the day before, which Hughes admitted was unprofessional.  Hughes asked Frazier to return to work the following Monday, which would have been Frazier's next regularly scheduled workday.  During that conversation, Hughes also said that, going forward, Frazier would not have to report to Hughes and could work directly with Soja.

---

[2] Frazier testified at his deposition that Hughes refused to let him state what had happened that morning but if he had been allowed he would have told Hughes what had happened between himself and Rizk and DeSario that morning.  Frazier Dep. at 129–30.  When asked what was said at the meeting, he stated that Hughes asked him why he was not doing the work:

> I said that's not why I came here.  I came here to see if the work could be divided amongst the other analysts like myself, because I felt that the work load was heavier than it has been for me in the past.  And me starting at noon or at 3:00 o'clock would keep me at work a lot longer than I would originally be scheduled to be.

Frazier Dep. at 130–31.

On the following Monday, December 19, 2005, Frazier chose not to report to work at Abraxis. Frazier has testified that he understood that he could have returned to work on December 19; yet, he maintains that because he was asked to turn in his badge on December 15, he had been fired. On December 21, Frazier received a certified letter from Soja stating that he had failed to show up for work on December 19. Frazier made no attempt to contact anyone at Abraxis until December 22 or December 23, when he called Soja. Frazier told Soja that he wanted to speak with the Vice President of Human Resources, Mia Igyarto ("Igyarto"), before deciding whether to return to work.

On December 27, Frazier and Igyarto spoke over the phone. Frazier told her that he was worried about his workload but did not express concerns about his supervisor or the human resources manager. Frazier and Igyarto ultimately agreed that he would return to work on January 4, 2006.

On January 3, 2006, Frazier filed with the EEOC a Charge of Discrimination based on race against Abraxis. Abraxis has presented unrebutted evidence that the company did not receive notice from the EEOC about these charges until many weeks later.

On January 4, Frazier reported for work at Abraxis. Upon his return, Frazier met with Igyarto, DeSario and Soja, and was a given a letter, which he signed, that outlined the terms of his return to work and described his time away as unpaid leave. Although Frazier has testified that he believed he had been terminated and that the letter inaccurately stated otherwise, he did not mention this discrepancy at the time he was presented with and signed the letter. At the same meeting, Frazier was also provided with a disciplinary document, which stated that he had failed to engage in any testing on December 15, 2005, despite the direction of Rizk, and that one

9

day of his unpaid leave would be considered a suspension. Frazier refused to sign this document and instead prepared a rebuttal.

On January 4, Frazier also learned that he had been transferred to the Environmental Monitoring Group as an Associate Scientist and would now be reporting to Supervisor Dan Hrnciar. That same day, Frazier was put on a performance plan, which outlined his responsibilities and his employer's expectations going forward. As part of his new responsibilities, Frazier was occasionally required to remove red drums, which were filled with waste, from the lab. Prior to his arrival in the Environmental Monitoring Group, this responsibility was shared among the members of the group, but after he joined the group, Frazier alleges, he was the only person given this responsibility.

Frazier quit his job on March 21, 2006, after securing a position with another company. In his deposition, Frazier testified that he never heard any supervisor or member of management at Abraxis make any sort of racial or ethnic slur.

## PLAINTIFF'S THEORY OF THE CASE

The first amended complaint alleges discrimination based on race in the following respects: Frazier was discriminated against when he met with Hughes to discuss his working conditions in relation to those of white employees in that he was not allowed to discuss his concerns whereas white employees were so allowed, and that he was physically assaulted, intimidated, and demeaned in the presence of other employees whereas white employees were not so mistreated. He claims retaliation after he filed a charge of discrimination on January 3, 2006, based on his transfer to new duties, excessive monitoring, and other conduct constituting a hostile work environment and eventual constructive discharge, as well as denial of a bonus for

10

2005 and an unfavorable performance review in 2006. Frazier's memorandum in opposition to the motion characterizes his claims similarly, although he does not suggest race discrimination in work assignments.³ braxis characterizes Frazier's discrimination claims differently from that of the amended complaint. Abraxis states that Frazier presents claims of discrimination in work assignments and discipline, leading to termination on December 15, 2005, as well as his claim for retaliation in 2006.

This malalignment of the issues presents some difficulty in addressing the pending motion. Because Frazier has presented no evidence that non-African-American scientists were given lighter work loads than he, or that non-African-American scientists with similar work records were disciplined more harshly than he, the court must assume that this is not plaintiff's theory of the case. Rather, the court infers that Frazier contends (a) that the treatment he received from Hughes on December 15, 2005, including the alleged termination, was based on

---

³ The opening paragraph of the plaintiff's submission states as follows:

> This cause of action stems from a series of discriminatory acts committed by the Defendant against the Plaintiff, an African-American scientist, while under the employ of the Defendant. . . . During the course of his employment, Mr. Frazier complained to his supervisor, Christine Rizk, multiple times regarding the size of his workload compared to other scientists in his group. On December 15, 2005[,] Mr. Frazier attempted to relate employment grievances to Brad Hughes, the Defendant's human resources manager. Mr. Frazier felt that his supervisor, Christine Rizk, was assigning him more work that other scientists in his work group. When he attempted to speak with Brad Hughes, he was not allowed to relate his employment grievances while white employees were so permitted. While [] Mr. Frazier was attempting to leave Mr. Hughes' office, Mr. Hughes grabbed and detained Mr. Frazier. Further, Mr. Hughes followed Mr. Frazier outside of the office while Mr. Frazier was attempting to exit the building and subjected him to a series of discriminatory and humiliating acts white employees were not subjected to.

Pl.'s Response Mem., 1–2.

Hughes' discriminatory animus and (b) that he was retaliated against after he returned to work in January because he filed a charge of discrimination.

## DISCUSSION

Title VII prohibits an employer from discriminating against an employee because of his race and from punishing an employee for complaining about discrimination. 42 U.S.C. §§ 2000e-2 and 2000e-3(a). Section 1981 also prohibits racial discrimination against an employee, though it is "limited in scope to discrimination on the grounds of race in the 'mak[ing] and enforc[ing][of] contracts.'" *Thanongsinh* v. *Board of Educ.*, 462 F.3d 762, 782–83 (7th Cir. 2006) (quoting 42 U.S.C. § 1981(a)). Claims for discrimination "may be proven either directly . . . or indirectly under the burden-shifting method established in *McDonnell Douglas*." *Scaife* v. *Cook County*, 446 F.3d 735, 739 (7th Cir. 2006) (citing *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Under the direct method, a plaintiff may prove his case through direct evidence (such as an admission by the decision maker that his actions were based on unlawful animus) or through circumstantial evidence, "*i.e.*, evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Rogers* v. *City of Chicago*, 320 F. 3d 748, 753–54 (7th Cir. 2003) (citations omitted). Under the direct method, plaintiff's evidence, whether direct or circumstantial, must be sufficient to permit a jury "to conclude that the employer acted because of a forbidden animus." *Id.* at 754.

Under the indirect method, the plaintiff bears the burden to establish a prima facie case of discrimination, which is the same whether the claim is brought under Title VII or § 1981. *Scaife*, 446 F.3d at 739 (citing *Cerutti* v. *BASF Corp.*, 349 F.3d 1055, 1060–61 n.4 (7th Cir. 2003)). To establish a prima facie case of discrimination under the indirect method established

in *McDonnell Douglas*, the plaintiff must show that "(1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations at the time of the alleged adverse action; (3) he was subjected to an adverse employment action; and (4) the employer treated similarly situated employees not in the protected class more favorably." *Id.*

Similarly, a claim for retaliation may be proven indirectly or directly. *Id.* Under the indirect method, to establish a prima facie case of retaliation, the plaintiff must show that "(1) he engaged in statutorily protected activity; (2) he was performing his job according to his employer's legitimate expectations; (3) he suffered a materially adverse action; and (4) he was treated worse than a similarly situated employee who did not engage in statutorily protected activity." *Id.*; *Graham* v. *AT&T Mobility, LLC*, Nos. 06-3020, 06-3734, 2007 WL 2565999, at *3 (7th Cir. Sept. 6, 2007). Thus, the second, third, and fourth elements of a prima facie case of retaliation are essentially the same as those of a prima facie case for discrimination.

In either the discrimination or the retaliation context, "once the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action." *Scaife*, 446 F.3d at 739. If the defendant has provided such a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is merely a pretext for unlawful discrimination. *Id.* at 739–40.

In its motion for summary judgment, Abraxis assumes that Frazier must proceed according to the indirect method of proof and argues that Frazier has failed to establish the second, third, and fourth elements of his prima facie case. Frazier responds by arguing that he has met his burden under the indirect method of proof. Thus, the court infers that Frazier does

13

not contend that his version of the encounter in Hughes' office is direct evidence of discrimination. Indeed, that would be a difficult task even though Hughes' conduct was uncivil. *See Faragher* v. *City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (stating that standards for judging a hostile work environment "are sufficiently demanding to ensure that Title VII does not become a 'general civility' code"); *Vitug* v. *Multistate Tax Comm'n*, 88 F.3d 506, 517–18 (7th Cir. 1996) (affirming summary judgment where plaintiff did not put forth any evidence that the failure to promote and boss's incivilities (e.g., confrontational behavior, "silent treatment") were a result of plaintiff's religion or national origin).

Under the indirect method of proof, it is plain enough that even if Frazier can demonstrate that at the time of his encounter with Hughes he was meeting his employer's legitimate expectations, and that he was in fact fired at that time, he has no presented no evidence that similarly situated employees who complained of excessive demands were treated more favorably than he. Oddly, Frazier's proof does not even indicate the race of the "other scientists," and in his memorandum in opposition to the motion, he never refers to the race of any other scientist but merely contends that he was given a more demanding workload than that of other scientists. He certainly cites no instance of another scientist who complained to Hughes who received better treatment than he.

Seeming to ignore his burden of production of proof of disparate treatment, Frazier argues that, in the aggregate, the following items constitute adverse employment action against him by Abraxis:

14

(1) beginning in the summer of 2005, Frazier was assigned an increased workload, which he was asked to complete despite his repeated requests to management that his workload be reduced;

(2) Brad Hughes mistreated him on December 15, 2005, when

    (a) Hughes's accused him of being insubordinate,

    (b) Hughes's grabbed his shoulder in an attempt to keep him from leaving the room, and

    (c) Hughes's used profanity towards him;

(3) also on December 15, 2005, Hughes fired Frazier when:

    (a) Hughes told him as he was leaving the building that he would not receive his paycheck until he turned in his badge, and

    (b) Frazier received advice of his COBRA rights; and

(4) after Frazier was assigned to the Environmental Monitoring Group in January 2006,

    (a) Frazier was subjected to a performance plan that no other employee was subjected to, and which called for daily, weekly, and monthly reviews, and

    (b) Frazier received sole responsibility to take out the red drums (containing waste product), a duty formerly shared by all the members of the Environmental Monitoring Group.

All this evidence proves, however, is that Abraxis took action against Frazier. Without evidence that it was race-based, he simply cannot prove his prima facie case.

Furthermore, other than the incident in Hughes' office, Abraxis has proffered nondiscriminatory reasons for all of the actions alleged by Frazier: The increased workload and

longer hours required of Frazier were a consequence of contamination that was discovered during the summer of 2005, and these heightened requirements were imposed not only on Frazier but on other employees as well. Likewise, Abraxis asserts that the transfer to a different assignment and the performance plan were based on Frazier's deficient performance in the Microbiology Finished Product Group.

With respect to the question whether Frazier was fired by Hughes, there is no dispute of fact that the firing was withdrawn and Frazier returned to work. The only possible adverse action would be a loss of pay for the interim. Even if the court were to determine that Abraxis terminated Frazier on December 15, 2005, there is substantial evidence to support the legitimate, nondiscriminatory reason that Abraxis has proffered: by his own admission, Frazier refused to conduct any testing on that day.

Where the defendant has provided a legitimate, nondiscriminatory reason for its treatment of the plaintiff, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is merely a pretext for unlawful discrimination. *Scaife*, 446 F.3d at 739–40. In order to prove pretext, a plaintiff must present facts that cast doubt on the reasons given by the defendant. *See Clay* v. *Holy Cross Hosp.*, 253 F.3d 1000, 1007 (7th Cir. 2001); *see also Sweeney* v. *West*, 149 F.3d 550, 557 (7th Cir. 1998) ("Establishing pretext requires more than excusing the employer's stated reason for its decision; the plaintiff must call the employer's honesty into question by rebutting the reason given."). In this case, Frazier has failed to show that Abraxis's proffered reasons are merely a pretext for unlawful discrimination. Indeed, plaintiff's response memorandum contains no apparent argument—much less a compelling argument—that defendant's proffered reasons are a pretext for unlawful discrimination. As a

consequence, even if plaintiff had established a prima facie case of discrimination or retaliation, summary judgment in favor of the defendant would nonetheless be required. *See, e.g.*, *Clay*, 253 F.3d at 1009 (affirming summary judgment in favor of defendant employer where plaintiff failed to demonstrate that defendant's proffered reason for termination of plaintiff was a pretext for discrimination).

A similar lack of evidence dooms Frazier's claim that Abraxis retaliated against him following his return to work on January 4, 2006. Abraxis has presented evidence that the company was not even aware that the plaintiff had filed a Charge of Discrimination with the EEOC until several weeks after Frazier returned to work. Frazier has no evidence to the contrary. Moreover, because the charge was filed but the day before Abraxis imposed the performance plan on Frazier, it is most unlikely that Abraxis had any notice of the charge so as to permit an inference of retaliation. "Retaliation necessarily assumes knowledge of the predicate protected activity . . . . [a]n employer cannot retaliate for something of which [it] does not know." *Damato* v. *Jack Phelan Chevrolet Geo, Inc.*, 927 F. Supp. 283, 288 (N.D. Ill. 1996). Thus, "[i]f decisionmakers are not aware of protected activity, such activity cannot be a cause or motive for discharge." *Id.*

**CONCLUSION AND ORDER**

Plaintiff has failed to present a legal or factual basis that would allow a reasonable trier of fact to find that Abraxis's conduct was either racially discriminatory or a retaliatory response to his filing of a discrimination charge with the EEOC.

17

The court therefore grants defendant's motion for summary judgment [#33] on all counts of plaintiff's complaint. This case is terminated.

Dated: December 20, 2007          Enter: _____

                                  JOAN HUMPHREY LEFKOW
                                  United States District Judge